THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WILLIE JAMES GAINES, Defendant-Appellant.

First District (1st Division)    No. 80-1231

Opinion filed March 8, 1982.

Ralph Ruebner, of State Appellate Defender's Office, of Chicago (Alan M. Freedman and Bruce H. Bornstein, both of Freedman & Bornstein, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Dean C. Morask, and John A. Ward, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Defendant Willie Gaines was indicted on January 7, 1974, for the murder of Charles Polk. His first trial, in September 1977, ended in a mistrial because of a hung jury. After a second jury trial, defendant was convicted of murder and sentenced to 20-40 years imprisonment and fined $1,800. Defendant appeals, contending that (1) comments made by the prosecutor during closing argument constituted reversible error; (2) he was not proved guilty beyond a reasonable doubt; and (3) the court erred in ordering defendant to pay a fine of $1,800 to be taken from his bond money.

Michael Richardson testified that on October 15, 1973, he went to his girlfriend Patricia Bell's family's apartment with defendant, whom he referred to as "Little June." Richardson went into the bedroom to take a nap, while defendant went into the living room to have his hair braided by Bell. When Richardson awoke from his nap, he saw defendant standing in the front doorway firing a shotgun at Charles Polk. Richardson admitted that a statement which he had given police regarding an argument between defendant and the deceased, which Richardson had stated he had witnessed, was actually the result of information given him by other people.

Patricia Bell testified that on October 15, 1973, she resided with her mother Betty Hill and her sister Debra. On that date, besides her family, Michael Richardson, Henry Kimp, Charles Polk and Willie Gaines were at the apartment. She had been braiding defendant's hair. When she finished, she went into the bedroom where Richardson was taking a nap. While in the bedroom, she heard the raised voice of Charles Polk. When she came out of the bedroom, defendant was leaving through the front door. Bell testified that as defendant left, he stated, "That's all I was waiting for him to do." Ten or twenty minutes later, she went into the kitchen where she heard a knock on the back door. Bell called her sister, who opened the door to find defendant holding a shotgun. Defendant then walked through the apartment and, not seeing Polk, went to the front door. At the front door defendant found Polk, who refused to enter the

apartment because of an argument he had earlier that day had with Debra Bell. Polk was talking to Henry Kimp. Defendant then shot Polk. Bell also testified that she knew a Roger Fenison and said he was like a brother. Bell had known defendant for two years prior to the incident.

The testimony of Debra Bell Brown, Patricia Bell's sister, was similar to that of her sister. Earlier in the day on October 15 she had had an argument with her boyfriend Polk. The deceased returned to the apartment a few hours after the argument and was invited in by Brown, but he refused to enter.

Henry Kimp testified that he was a friend of the deceased. During the day of the shooting, Kimp and Polk had been drinking in a vacant lot and Polk was "feeling good." Later that day they went to the apartment, where they had a few drinks on the sunporch with Betty Hill, who was intoxicated at the time. Kimp saw defendant and Polk engage in a brief shoving match just before he dozed off. He was awakened later when Polk wanted to speak to him in the hall. Kimp went into the hall where he saw Polk being shot. Prior to the incident Kimp did not know Willie Gaines. Afterward, he did not speak with police until after he had spoken with the family.

Homicide Investigator John Dahlberg, of the Chicago Police Department, testified that on October 15, 1973, he went to Patricia Bell's family home. He observed a pool of blood in the front hall and that Betty Hill had been drinking quite heavily.

Dr. Zalala stipulated that Charles Polk died of multiple gunshot wounds to the abdomen, chest and elbow. Blood samples revealed that at the time of his death Polk was intoxicated.

Vivian Gaines, defendant's mother, testified that on October 15, 1973, she saw her son at approximately 8:50 p.m. and at that time he did not have a gun.

Roger Fenison, a friend of the Bell sisters, testified that he had on numerous occasions seen a shotgun in the family's apartment.

Defendant testified that on October 15, 1973, he had been at the Bell apartment. When he arrived, Bell asked him to go out and get Michael Richardson to help her with Polk, who was intoxicated and causing trouble. When he returned with Richardson, Bell braided his hair, during which time he overheard the loud voices of Polk and Betty Hill. Betty, who was intoxicated, said she was going to shoot the first person that came to the door and, in fact, she was going to shoot through the door. At this point defendant left the apartment and went home to check on his brothers and sisters. He then went to the home of a Mrs. Smith and her son Ronald, who lived at 19th and Pulaski. He watched television there until 11 p.m. That night, while defendant was at the Smith home, a visitor came to the door and spoke to Ronald. He told Ronald that the police were

looking for "Little June." No one other than the Bell family knew defendant as "Little June." Defendant left and went to visit a friend named Cindy. He stayed there until October 19, when he surrendered to police. Defendant testified that while he was imprisoned Ronald Smith and his mother moved from their home at 19th and Pulaski.

At the discovery stage, pursuant to a written discovery request filed by the State, defendant submitted the names of defendant's alibi witnesses: Mrs. Smith and her son Ronald.

In closing argument the prosecutor stated that Mr. Smith was a "phantom" and that this was the reason neither he nor his mother could be found to testify. The State argued that if the Smiths did exist the defense would have initiated some sort of investigation as to their whereabouts.

We disagree with defendant's contention that he was prejudiced by certain comments made by the prosecutor in closing argument which noted defendant's failure to call alibi witnesses. During his opening statement, defense counsel referred to defendant's expected testimony that he was at the home of a Mrs. Smith and her son Ronald at the time Polk was murdered. Defendant then testified that at the time Polk was shot he (defendant) was watching television with the Smiths at their home. During closing argument the prosecutor stated that Mr. Smith was a "phantom." Defense counsel stated in reply that the Smiths existed because defendant's mother testified that defendant told her he was going to the Smiths. In rebuttal argument the prosecutor responded:

> "If these people [the Smiths] really existed and could have supported that alibi, ladies and gentlemen, don't you think there would have been a check with schools, a check with welfare, a check with the arrest record, a check with past employment and a check of the neighbors, a check with the landlord?"

■■ Generally, it is improper for the prosecution to comment on a defendant's failure to present witnesses when such witnesses are as accessible to the State as they are to the defendant. However, when alibi witnesses are injected into a case by the defendant, they are deemed unavailable to the prosecution and comment on the failure of such witnesses to testify is proper. (*People v. Jackson* (1979), 79 Ill. App. 3d 660, 398 N.E.2d 906.) Defendant injected the Smiths into the case and then did not call them as witnesses or explain their absence. We find it was proper for the prosecutor to comment on the failure to call the Smiths because this is a factor a jury may properly consider. *People v. Blakes* (1976), 63 Ill. 2d 354, 348 N.E.2d 170.

■■ We also disagree with defendant's contention that he was not proved guilty beyond a reasonable doubt. The first reason advanced is that the State's four witnesses who testified that they saw defendant shoot Polk were incredible because they were all "intimately involved with one

another and with Betty Hill." Concerning this argument we note that the bias of a witness is always pertinent on the question of the credibility of the witness. (*People v. O'Dell* (1980), 84 Ill. App. 3d 359, 405 N.E.2d 809.) It is, however, for the trier of fact (in the instant case, the jury) to determine the credibility of witnesses and the weight to be accorded their testimony. (*People v. Mahon* (1979), 77 Ill. App. 3d 413, 395 N.E.2d 950.) Furthermore, "[i]t is neither the duty nor the privilege of a reviewing court to substitute its judgment as to the weight of disputed evidence or the credibility of witnesses for that of the trier of fact who heard the evidence presented and observed the demeanor of the witnesses * * *." *People v. Novotny* (1968), 41 Ill. 2d 401, 412, 244 N.E.2d 182.

■■ Here, the jury heard the testimony of the four eyewitnesses concerning the incident. The jury was also informed as to the nature of the relationship each of these witnesses had with defendant. Furthermore, the jury heard defendant's testimony concerning his version of the incident. We cannot find that the claimed bias of the witnesses is sufficient to raise a reasonable doubt of defendant's guilt.

Defendant's second reason in support of his reasonable doubt argument is that there are certain inconsistencies regarding Polk's presence at, departure from and return to the apartment and the time sequence in which the events occurred. Defendant contends that an inconsistency exists in the testimony because the evidence revealed that, although deceased and Debra Bell Brown had had an argument earlier in the day, upon deceased's initial arrival at the apartment he did not hesitate to enter the home and yet, when he returned to the apartment after leaving for some time, he refused to enter allegedly because he did not feel welcome due to his argument with Debra. Defendant argues that the most probable reason for Polk not to re-enter the apartment is that Polk feared Mrs. Hill. However, there was no testimony that Polk feared Mrs. Hill; therefore, there is no support in the record for this conclusion.

■■ Defendant also argues that there were inconsistencies in the testimony as to the time defendant and Polk left and then returned to the apartment. The State's witnesses testified that after defendant's encounter with the deceased defendant left for 20-30 minutes before returning with the gun. Debra Bell Brown later testified that after defendant left, Polk left and did not return for a few hours. In view of the fact that four witnesses testified that they saw defendant shoot Polk, we do not find that this discrepancy in the testimony regarding the sequence of events is of such magnitude to create a reasonable doubt of defendant's guilt.

Defendant's final contention is that the trial court abused its discretion in fining defendant $1,800 to be paid out of defendant's bail bond deposit. Defendant claims error in that the court did not consider the financial resources and future ability of defendant to pay the fine and

instead imposed the fine in order to reimburse the county for the cost of providing defendant's court-appointed counsel. When imposing the fine, the judge stated:

"The taxpayers of this county invested an enormous amount of money in trying—providing Mr. Gaines the fair trial which, I believe, he had including but not limited to the assistance of you.

That eighteen hundred dollars, in my judgment, is but a small contribution to the enormous expense that the taxpayers went through to put this man to trial in two different occasions."

The State argues that the court did consider defendant's financial resources and future ability to pay the fine when it considered defendant's presentence investigation report and heard defendant's testimony that he had earned his bond money while in jail and that while he was released on bond he had been employed in several different capacities.

■■ The sentence imposed by a trial court must be affirmed unless there is a showing that the trial court abused its discretion. (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.) Section 5—9—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1977, ch. 38, par. 1005—9—1) provides that an offender may be sentenced to pay a fine which, for a felony, shall not exceed the greater of $10,000 or the amount specified in the offense. The fine may be imposed in addition to a sentence of imprisonment. This section further provides that in determining the amount and method of payment for a fine the court shall consider "the financial resources and future ability of the offender to pay the fine * * *." Ill. Rev. Stat. 1977, ch. 38, par. 1005—9—1(c)(1).

In the instant case, the sentencing judge specified his reasons for imposing the sentence of imprisonment and a fine. His comments indicated that the sentence was based on the circumstances surrounding the murder. When asked specifically about the fine, the judge stated that the fine was appropriate because defendant had been represented in two trials by court-appointed counsel and the payment of the fine was but a small contribution to the enormous expense the taxpayers had borne. Defendant relies on *People v. Cook* (1980), 81 Ill. 2d 176, 407 N.E.2d 56, which held section 110—7(g) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 110—7(g)) unconstitutional. That section provided that when a defendant who had been admitted to bail utilized the services of the public defender or other appointed counsel, the amount deposited could be used to reimburse the county for funding the legal services. The court found that the statute in *Cook* created an irrebuttable presumption that one posting bond had the financial ability to pay for counsel and did not require the sentencing judge to inquire into a defendant's ability to pay.

■■ ■ We find that *People v. Cook* is distinguishable from the present

case. Section 5—9—1(c), under which defendant was fined, creates no presumption that a defendant has the financial ability to pay and requires the court to inquire into a defendant's actual ability to pay before imposing a fine. Although we believe that reimbursement of the county for the cost of court-appointed counsel is not an appropriate reason to impose a fine under section 5—9—1(c), we find that the record supports the imposition of a fine in the instant case. The record here shows that the judge heard evidence regarding the financial resources and future ability of defendant to pay the fine. Furthermore, "when a fine and imprisonment are imposed, they are imposed as one sentence, with the reasons specified supporting the entirety." (*People v. Bishop* (1980), 81 Ill. App. 3d 521, 524, 401 N.E.2d 648.) We affirm the fine imposed.

The judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL, P. J., and GOLDBERG, J., concur.